## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **KAREN BURNETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 05-2514-KHV** |
| **SOUTHWESTERN BELL TELEPHONE, L.P.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Karen Burnett brings suit against Southwestern Bell Telephone, L.P. for retaliatory discharge in violation of the Family and Medical Leave Act, 29 U.S.C. § 2611 et seq. ("FMLA"), and the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA").[1]  This matter is before the Court on Defendant's Motion For Partial Summary Judgment [On Plaintiff's FMLA Claim] (Doc. #48) filed September 22, 2006 and Plaintiff's Motion For Leave To File A Surreply Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #58) filed December 1, 2006.  As a preliminary matter, the Court sustains plaintiff's motion for leave to file a surreply.  For reasons stated below, the Court also sustains defendant's motion for summary judgment on plaintiff's FMLA claim.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that

---

[1]    The Court previously certified an issue to the Kansas Supreme Court regarding what statute of limitations applies to plaintiff's ERISA claim.  See Memorandum And Order (Doc. #30) filed June 14, 2006.  The Kansas Supreme Court has not yet ruled on the matter.

the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated §., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on his pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."

2

Anderson, 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Rule 56(e) also requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith." To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards those portions which are not shown to be based upon personal knowledge or otherwise do not comply with Rule 56(e). Maverick Paper Co. v. Omaha Paper Co., 18 F. Supp.2d 1232, 1234-35 (D. Kan. 1998).

**Facts**

The following facts are either uncontroverted or, where controverted, construed in the light most favorable to plaintiff:

## I.   Defendant's Attendance Policy

Defendant's policy requires "good attendance and punctuality." Operating Practice No. 45, Defendant's Exhibit B ¶ 1.2. The policy states that "[g]ood attendance means a demonstrated ability to be on the job on time over sustained periods of time." Id. The policy provides that

> [t]here is no absolute mathematical standard for determining good or bad attendance. The determination of whether a particular employee's attendance is satisfactory or not is made on an individual basis, taking into account all of the relevant factors pertaining to each employee's attendance record.

Id. ¶ 1.3. Under the policy, defendant does not discipline employees for FMLA-approved absences and does not consider such absences when deciding whether to fire an employee.

## II.    Defendant's Discipline Policy

Defendant maintains a progressive discipline policy.  Southwestern Bell Telephone Company Positive Discipline Policy and Procedure ("Discipline Policy"), Defendant's Exhibit C.  The policy provides that defendant will accomplish most performance improvement through recognition of good performance or employee discussions.  Id. ¶ 3.3.  Where discipline is required, the policy sets forth three progressive levels.  Most cases begin at level one with a "performance notice."  Id. ¶ 3.3(A).  At this level, the supervisor and employee discuss the job performance problem; the supervisor informs the employee that defendant expects improvement and indicates what consequences will result if the employee is not improve. Id. ¶ 3.3(A)(1).  A  performance notice remains active for six months, and an employee may have one active performance notice in each performance category.[2]  Id. ¶3.3(A)(3)(c).  If a problem continues within the same performance category, or if the employee has three active performance notices in any categories, the employee must progress to the next higher level of discipline.  Id.

The second level of discipline is a "written reminder," which documents a formal conversation between a supervisor and employee about a "very serious" performance problem.  Id. ¶ 3.3(B).  The supervisor follows up with a written reminder to the employee which summarizes the conversation.  Under the policy, defendant issues a written reminder when (1) an employee's performance has not met job requirements during the six-month active time period for a performance notice; (2) an employee already has three active performance notices in separate categories; or (3) a single incident occurs which is serious enough to warrant a written reminder, regardless of previous discipline.  Id. ¶ 3.3.(B)(1).  A written

_____

[2]        Although the record is not clear, it appears that the policy covers three performance categories: (1) measurement of work, (2) attendance/punctuality and (3) safety.  Id. ¶ 2.1.

4

reminder remains active for nine months, and an employee may have only one written reminder active in any one performance category.  Id. ¶ 3.3(B)(3)(d).  If problems continue within the same performance category, or if the employee has two written reminders in different performance categories, the employee must progress to the next higher level of discipline.  Id.

The third level of discipline is a "decision making leave" ("DML"), which begins with a formal discussion between a supervisor and employee about an "extremely serious" performance problem which can result in dismissal.  Id. ¶ 3.3(C).  The discussion typically occurs just before the end of the employee's shift.  The supervisor informs the employee of the seriousness of the situation and asks the employee to decide whether he or she can commit to meet all job requirements.  At the end of the discussion, the supervisor places the employee on DML with pay for the following scheduled work day.[3]  Upon returning the next scheduled work day, the employee must report to the supervisor whether he or she can commit to meet all job requirements.  If not, the employee may resign.  Id.  Under the policy, defendant applies a DML when (1) an employee has not achieved and maintained job performance requirements during the nine-month active time period for a written reminder; (2) an employee already has two active written reminders in separate categories; or (3) an employee commits an "extremely serious offense," regardless whether previous discipline has occurred.  Id. ¶ 3.3(C)(1).  A DML remains active for 12 months, and an employee may have only one active DML at a time.  Id. ¶ 3.3(C)(3)(d).  If an employee commits an infraction while a DML is active, the immediate supervisor must document the infraction and forward an appropriate recommendation to the next two higher levels of management.  Id. ¶ 3.3(C)(3)(e).  The policy

---

[3]      If an employee receives a DML which is subsequently deactivated, defendant ordinarily does not give the employee another paid day off if it issues another DML to that employee.

further provides that "[i]f the infraction is not deemed worthy of dismissal, the documentation will be covered with the employee and placed in the employee's personnel file." Id.

If a problem recurs after a discipline action is no longer active, the policy provides as follows:

Occasionally, a problem may reoccur in a deactivated performance category. In some cases, the situation can be dealt with through an employee discussion. If the problem warrants a step of discipline, generally, the employee will "start over" at Step 1 (Performance Notice). However, a manager is not required to start over at Step 1 if the situation is such that a more severe step of discipline, including dismissal, is appropriate. All relevant factors, including the following, should be taken into account when determining which course of action to take:
    A.  seriousness of the performance problem;
    B.  length of time since deactivation;
    C.  chronic pattern of same or similar performance problems;
    D.  current active Performance Notices or Written Reminders; and
    E.  any mitigating or aggravating circumstances.

Id. ¶ 4.2.

## II.    Plaintiff's Employment With Defendant

In August of 1996, plaintiff began working as a part-time customer service representative for defendant. On November 1, 1999, she became a full-time employee. At all relevant times, plaintiff understood defendant's attendance policies and expectations.

At relevant times, Jason Crawford was plaintiff's area manager, Angela Ross directed the consumer sales acquisition center and Teresa Morris managed the consumer sales acquisition center. Morris' duties included gathering information concerning employee attendance, calculating hours worked and tracking hours used under the FMLA. In performing such duties, Morris maintained a so-called "SW-9115" form which tracked when an employee missed work, the reason for the absence and whether it was covered by the FMLA.

On May 30, 2002, defendant issued plaintiff a performance notice for absences totaling 47 hours and 20 minutes.[4] Nearly a month later, on June 27, 2002, defendant deactivated the notice because FMLA covered the triggering events for the notice. In deactivating the notice, Morris advised plaintiff as follows:

> This is notify you I will be deactivating you[r] Performance notice for attendance due to you getting the 2 occurrences 5/11-5/13/2002 and 4/23/-5/2/5/2002 FMLA approved. This was the agreement I had made during the performance notice meeting.

Defendant's Exhibit G.

From June 3 through June 8, 2002, plaintiff missed work due to the death of her mother-in-law. Although its funeral leave policy did not apply, defendant allowed plaintiff to take the days off without discipline.

On August 3, 2002, plaintiff again missed work. The FMLA did not protect this absence because plaintiff did not provide a medical certification.

Beginning August 13, 2002, plaintiff stopped work due to post-traumatic depression and stress. The FMLA protected her absence until October 28, 2002, when plaintiff exhausted her available FMLA leave for the calendar year. Plaintiff did not report to work, however, after her FMLA leave expired.

On December 9, 2002, Morris called plaintiff and told her that she would lose her job if she did not report to work by December 16, 2002. In so doing, Morris acted contrary to defendant's typical practice, which is to let the employee decide whether and when to return to work.

On December 16, 2002, plaintiff reported to work.[5] Morris held an attendance discipline meeting

---

[4]    The record does not reflect the number of occurrences which plaintiff received for the absences.

[5]    The parties dispute whether plaintiff returned to work on December 16 or 17. For
(continued...)

and gave plaintiff a written reminder for unsatisfactory attendance.  Because she still suffered from post-traumatic depression and stress, plaintiff left work after an hour and did not return until January 20, 2003.  The FMLA did not cover her absence from December 17 through 31, 2002.[6]  Because defendant uses a calendar year to calculate FMLA leave availability, FMLA began covering plaintiff's absence again on January 1, 2003.[7]

Plaintiff filed a union grievance regarding the written reminder dated December 16, 2002.[8]  On January 21, 2003, defendant held a meeting to discuss the grievance.  The union asked defendant to either remove the written reminder or reduce it to a performance notice.  At the meeting, Morris explained that plaintiff had incurred another occurrence because she went back out on unprotected leave on December 17, 2002.  On January 27, 2003, defendant denied the grievance.

On January 20, 2003, plaintiff returned to work on a half-day schedule.  On January 27, 2003, she increased to six hours a day, and on February 1, 2003, she resumed full-time employment.  The FMLA covered plaintiff's absence from January 1, 2003 to February 1, 2003.

––––––––––––––––––––––

[5](...continued)
purposes of this ruling, the Court accepts plaintiff's assertion that it was December 16.

[6]       Plaintiff's SW-9115 for 2002 indicates that the absence on December 17, 2002 was FMLA-approved, but Morris contends that she made the notation in error.  See Affidavit Or Teresa Morris ¶ 3, Exhibit A to Defendant's Reply To Plaintiff's Memorandum In Opposition To Motion For Partial Summary Judgment ("Defendant's Reply") (Doc. #57) filed November 15, 2006.  As noted, on October 28, 2002, plaintiff exhausted her FMLA leave for 2002.

[7]       If an employee satisfies FMLA eligibility requirements, he or she can use 480 hours of FMLA leave during each calendar year.  To calculate eligibility for FMLA leave with respect to the requisite number of hours worked, defendant looks back 12 months from the first day of the leave-triggering event.

[8]       The record does not state when plaintiff filed the grievance.

On February 6, 2003, Morris held a DML meeting with plaintiff because the FMLA did not protect plaintiff's absence from December 17 to 31, 2002, and she had therefore incurred additional unprotected absences after the written reminder of December 16, 2002.  Pursuant to the DML, defendant gave plaintiff a paid day off on February 8, 2003, to decide whether she could adhere to its attendance requirements.[9] Plaintiff asked whether Morris was overstepping the performance notice (step one of the discipline policy). Morris replied that defendant did not start over on positive discipline for attendance.

Plaintiff filed a union grievance regarding the DML of February 6, 2003.  As a result of the grievance, defendant removed the written reminder of December 16, 2002 and reduced the DML of February 6, 2003 to a written reminder.  Defendant took these actions because Rob Semon, in human resources, said that he would not support management moving plaintiff two levels of positive discipline for absences due to the same disability.  In other words, he believed that management should not have issued both a written reminder and DML for plaintiff's absence from October 28, 2002 to January 20, 2003, because it was due to the one disability (post-traumatic depression and stress).

On February 24, 2003, plaintiff missed work for unexplained reasons.[10]

On March 1, 2003, defendant held a second DML meeting and informed plaintiff that any

---

[9]     When defendant placed plaintiff on DML, it informed her that for the next 12 months, she must maintain satisfactory performance in all areas of her job, including attendance. Plaintiff understood that she could be fired if she failed to meet these requirements.

[10]     Plaintiff does not know why she missed work on February 24, 2003. She does not believe that she requested FMLA coverage for this absence, and she does not contend that she was eligible for FMLA leave at that time. For the 12 months immediately preceding February 24, 2003, plaintiff worked a total of 1,043 hours, including overtime. To be eligible for FMLA leave, an employee must work at least 1250 hours during the 12 months preceding the date on which the leave commences. See 29 U.S.C. § 2611(2)(A)(ii).

subsequent attendance problems could result in termination.

On March 6, 2003, plaintiff telephoned work and told Morris that she was having difficulty breathing and did not feel well.[11]  Plaintiff asked to take FMLA leave.  Morris stated that plaintiff was not eligible for FMLA leave, but that she had six hours of vacation time available.[12]  Plaintiff informed Morris that her doctor had told her to go to the hospital.  Morris told plaintiff that she needed to do what her doctor advised.  Plaintiff did not report to work on that day or any day thereafter.

On March 10, 2003, Morris e-mailed Crawford (plaintiff's area manager) and Ross (director of the consumer sales acquisition center) the following synopsis of plaintiff's attendance and discipline in 2002 and 2003:

- **Performance Notice** on 5/30/02 . . . deactivated 6/27/2003 due to triggering events being covered by FMLA.

- Karen had an absence on 6/3 and 6/8/02 which was connected to her mother-in-law passing.  No action was taken.

- 8/3/2002 – Karen called in ill – filed FMLA – did not get final denial until 11/14/2002 – Karen was out on disability at that time – no action taken.

- 8/13/2002 – went out on disability.

- 10/28/02 – ran out of FMLA.

- 12/16/02 return to work – placed employee on **written reminder** for attendance due to 10/28–12/16 not being FMLA covered and employee had not demonstrated she could be at work for a substantial period of time.

---

[11]     Plaintiff suffered a pulmonary embolism, a condition unrelated to her prior post-traumatic depression and stress.

[12]     Plaintiff does not dispute that she was not eligible for FMLA leave.  For the 12 months immediately preceding March 6, 2003, plaintiff worked a total of 1,043.10 hours, including overtime.

- 12/17/02 – Karen relapsed on disability.

- Returned on 2/3/03 – progressed to a **DML** for attendance on 2/6/2003, for unprotected disability time after relapsing on 12/17/2002.

- Union filed grievance.

- Jason denied written reminder.

- Grievance went to Rob Semon.  Union advised Rob that Karen had been progressed to a DML.

- Rob Semon recessed grievance and advised he would not support us moving 2 levels of positive discipline on the same disability even though she returned and went back out.

- Karen had another absence on 2/24/2003 for a full day.  I contacted Rob to find out what action should be taken since we were in the middle of the grievance process.  Rob advised I should hold an employee discussion with Karen addressing the absence and advising her I would be getting back to her. I held that discussion on 2/27/2003.

- Rob contacted Debbie Snow on 2/27/2003 and they agreed to remove the written reminder on 12/16/02 to resolve the grievance.

- Rob advised that would [sic] change the DML on 2/6/2003 to a written reminder. Karen had already received a DML day on 2/8/2003 so she was not given another DML day off with pay when she was progressed back to a DML on 3/1/03 for the 2/24/03 absence.

- Karen then called in on 3/6/03 and begged for a vacation day.  I advised there were only 6 hours and she would have to come in from 5-7.  Karen took a 6 hour EWP.[13]  I then received a call from an emergency room nurse advising Karen Burnett had been admitted into the hospital and that Karen had ask[ed] her to call me and let me know she would not be there at 5:00 p.m.

- Karen has not returned to work since 3/6/03.  She has called in every day from the hospital.

---

[13]   The record does not explain what a "EWP" is.

- • Karen is not FMLA eligible due to not working 1250 hours in the last 12 months.

- • As of today, Karen has 7 occurrences for 424 hours and 25 minutes.

Deposition Exhibit 17, appendix to <u>Plaintiff's Opposition</u> (Doc. #52).

On March 19, 2003, Morris prepared an FMLA eligibility form regarding plaintiff's absence beginning March 6, 2003.  The form stated that "employee is not eligible for FMLA time due to not working 1250 hours."  Deposition Exhibit 15 at 2, appendix to <u>Plaintiff's Opposition</u> (Doc. #52).

Some time after March 19, 2003, Morris began working on a separation proposal for plaintiff.[14] With regard to plaintiff's attendance record, Morris reported that in 2002, plaintiff had five occurrences totaling 403 hours and 55 minutes, and that in 2003, plaintiff had two occurrences totaling 89 hours.[15] <u>See</u> Deposition Exhibit 19, appendix to <u>Plaintiff's Opposition</u> (Doc. # 52).

On March 21, 2003, Crawford left telephone messages on plaintiff's home and cellular telephones. When plaintiff returned the call, Crawford informed her that defendant was terminating her employment effective that day for unsatisfactory attendance.  In deciding to terminate plaintiff, defendant did not look merely to the number of plaintiff's occurrences; it also considered the length and reason for her absences.

_____

[14]        Morris testified that Crawford directed her to prepare the document, but she does not recall when he did so.  <u>See</u> Morris Depo. at 192:11-193:5, Defendant's Exhibit E.

[15]        Defendant's attendance policy defines an occurrence as a continuous period of absence. For 2002, defendant counted five occurrences on the following dates: (1) January 31; (2) February 14 to 18; (3) August 3; (4) October 29 to December 16; and (5) December 17 to 31.  For 2003, defendant counted two occurrences: (1) February 24; and (2) March 6 through 21 (the date of termination).

For the time period from August 13 through December 31, 2002, defendant assigned plaintiff two occurrences of unprotected leave (<u>i.e.</u> non-FMLA-covered leave).  If plaintiff had not returned to work on December 16, 2002 defendant would have charged her with only one occurrence for a continuous period of absence from October 29 through December 31, 2002.  Because plaintiff reported to work on December 16, however, defendant assigned her two occurrences: one for October 29 to December 16, 2002, and another for December 17 through 31, 2002.

12

Defendant does not have a mathematical formula for deciding when to terminate an employee for attendance problems. When an employee is absent after being placed on DML, defendant decides whether to terminate the employee on a case-by-case basis. Crawford typically made recommendations to Ross regarding whether defendant should fire an employee under his supervision. In this case, however, Crawford does not recall making such a recommendation. See Crawford Depo. at 173:22-25.

Ross had ultimate authority to decide whether to discharge an employee. In so doing, she typically relied on direct supervisors to provide accurate information, and she sometimes asked questions and reviewed documentation with them. Ross states that she decided to terminate plaintiff after conducting "a thorough investigation concerning her absenteeism, including, but not limited to, reviewing [plaintiff's] positive discipline records, attendance records, and documentation of employee discussions." Affidavit Of Angela Ross ¶ 3, Exhibit B to Defendant's Reply (Doc. #57).

Sharla Arrington, union steward, testified that based on her experience in representing employees in meetings with management, defendant typically waits for an employee to return to work before firing him or her. Specifically, Arrington testified as follows:

> Q.     . . . . Would it be the custom and practice of the company to give notice to the employee in the disciplinary process if the employee is on a leave of absence or FMLA or disability leave?
>
> A.     No. If they're gonna do something like that, they normally wait until you return back to work and then they meet with you . . . .

Arrington Depo. at 21:13-19.[16] Crawford testified that defendant typically does not discipline an employee

---

[16]     Defendant objects to Arrington's deposition testimony on the ground that the Court granted its motion to quash plaintiff's deposition notice for Arrington. In the motion to quash, defendant complained
(continued...)

13

unless he or she is present at work.

### Analysis

Plaintiff claims that defendant terminated her employment in retaliation for her seeking to take medical leave, in violation of the FMLA.  Defendant asserts that it is entitled to summary judgment because plaintiff cannot show that it willfully retaliated against plaintiff.  Specifically, defendant contends that plaintiff cannot establish that its stated reason for termination is pretextual.  Plaintiff disagrees and contends that the evidence supports a finding of pretext.  In addition, plaintiff argues that she has presented evidence sufficient to create a triable issue under a "mixed motive" theory.

## I.    Standard Of Proof

As a preliminary matter, the Court addresses the applicable standard of proof.  Defendant contends that because plaintiff brings a willful claim under the FMLA three-year statute of limitations, a heightened burden of proof applies to plaintiff's retaliation claim.  See Defendant's Memorandum (Doc. #49) at 12-13.  The FMLA provides a two-year limitations period for general violations and a three-year limitations period for willful violations of Section 2615.[17]  See 29 U.S.C. § 2617(c)(1) and (2).  In this case, plaintiff alleges

_____

[16](...continued)
that plaintiff's counsel was required to subpoena her pursuant to Rule 45, Fed. R. Civ. P. (instead of merely providing notice to counsel).  See Southwestern Bell Telephone, L.P.'s Motion To Quash The Notice Of Deposition Of Sharla Arlington [sic] (Doc. #40) filed August 22, 2006.  On September 14, 2006, Court granted the motion to quash as uncontested.  See Order (Doc. #46).  Sixteen days earlier, however, on August 29, 2006, Arrington gave deposition testimony.  Defendant complains that plaintiff never completed the examination and that defendant did not have an opportunity to cross-exam the witness.  Defendant's complaints, however, do not go to the admissibility Arrington's testimony.  Moreover, it appears that defendant could have resumed the deposition and cross-examined her if it so desired.  The Court will therefore consider Arrington's testimony in ruling on defendant's motion for summary judgment.

[17]      Section 2615 provides as follows:

(continued...)

14

a willful violation of Section 2615 and the parties have stipulated that the three-year statute of limitations

applies.[18]  See Pretrial Order (Doc. #49) filed September 19, 2006 at 2, ¶ 4(a)(ii).

The FMLA does not define the word "willful," but the Supreme Court has found that the word "is

generally understood to refer to conduct that is not merely negligent." McLaughlin v. Richland Shoe Co.,

486 U.S. 128, 133 (1988).  Under such standard, plaintiff must show "that the employer either knew or

showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Id.  By its

very nature, a retaliatory discharge claim requires that plaintiff show that defendant acted willfully, i.e. that

it decided to terminate her employment as a result of retaliatory animus. See Medlock v. Ortho Biotech,

---

[17](...continued)
  a) Interference with rights
          (1) Exercise of rights
          It shall be unlawful for any employer to interfere with, restrain, or deny the exercise
          of or the attempt to exercise, any right provided under this subchapter.
          (2) Discrimination
          It shall be unlawful for any employer to discharge or in any other manner
          discriminate against any individual for opposing any practice made unlawful by this
          subchapter.
  (b) Interference with proceedings or inquiries
  It shall be unlawful for any person to discharge or in any other manner discriminate against
  any individual because such individual--
          (1) has filed any charge, or has instituted or caused to be instituted any
          proceeding, under or related to this subchapter;
          (2) has given, or is about to give, any information in connection with any inquiry or
          proceeding relating to any right provided under this subchapter; or
          (3) has testified, or is about to testify, in any inquiry or proceeding relating to any
          right provided under this subchapter.

29 U.S.C. § 2615.

[18]        The two-year limitations period would apparently bar any claim based on a non-willful
violation.  Plaintiff filed her complaint on December 9, 2005, more than two years after defendant
terminated her employment on March 21, 2003.

15

Inc., 164 F.3d 545, 549 (10th Cir. 1999); cf. Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877 (10th Cir.

2004) (regardless of intent employer violates FMLA if it interferes with employee's right to take medical

leave); McClain v. Detroit Entm't, LLC, 458 F. Supp.2d 427, 437-38 (E.D. Mich. 2006) (employer intent

irrelevant to FMLA interference claim but integral part of FMLA retaliation claim).  Defendant cites no case

law which requires a heightened evidentiary standard for plaintiff's retaliation claim.  The Court will

therefore apply ordinary evidentiary standards.

## II.     Evidence Of Pretext

Plaintiff claims that defendant terminated her employment because she exercised rights under the

FMLA.  See 29 U.S.C. § 2615(a).  The burden-shifting framework of McDonnell Douglas Corp. v. Green,

411 U.S. 792, 802-05 (1973), and Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-56 (1981),

applies to such a claim.  See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1170

(10th Cir. 2006).  Plaintiff initially bears the burden of production to establish a prima facie case of

discrimination.  McDonnell Douglas, 411 U.S. at 802.  If plaintiff establishes a prima facie case, the burden

shifts to defendant to articulate a facially nondiscriminatory reason for its actions.  See Reynolds v. Sch.

Dist. No. 1, 69 F.3d 1523, 1533 (10th Cir. 1995).  If defendant articulates a legitimate nondiscriminatory

reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude

that defendant's proffered reason is pretextual, that is, "unworthy of belief."  Beaird v. Seagate Tech., Inc.,

145 F.3d 1159, 1165 (10th Cir. 1998) (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir.

1995)).

In this case, defendant does not contest that based on the close temporal proximity between the

exercise of plaintiff's FMLA rights and her termination, she can establish a prima facie case.[19] See Defendant's Memorandum (Doc. #49) at 14.  Defendant contends that plaintiff cannot show that its stated reason for discharge – that plaintiff violated its attendance policy – is pretextual.

Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).  While "[t]his burden is not onerous . . . it is also not empty or perfunctory."  Id. at 1323-24.  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  More specifically, evidence of pretext may include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying

---

[19]     To establish a prima facie case, plaintiff must show that (1) she engaged in protected activity; (2) she suffered materially adverse action; and (3) a causal connection exists between the protected activity and the materially adverse action.  See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006) (citing Burlington N. & Santa Fe Ry. Co. v. White, --- U.S. ----, 126 S. Ct. 2405, 2414-15 (2006)).

As noted, plaintiff took FMLA leave from January 1 through 31, 2003.  Defendant terminated her employment seven weeks later, on March 21, 2003.  The Tenth Circuit has held that for purposes of establishing a prima facie case, a one and one-half month period between protected activity and adverse action may, by itself, establish causation.  See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).

17

or manipulating . . . criteria); and the use of subjective criteria." <u>Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1328 (10th Cir.), <u>cert. denied</u>, 528 U.S. 815 (1999).

Plaintiff argues that the following evidence demonstrates pretext: (1) the timing of her termination; (2) a pattern of adverse employment action which began shortly after she exercised rights under the FMLA; (3) defendant's conduct in violation of its written policy; (4) defendant's use of subjective criteria; and (5) inconsistent explanations regarding the precise dates of plaintiff's five occurrences in 2002.

### 1.    Timing

Plaintiff asserts that the close temporal proximity between her request for FMLA leave on March 6 and her termination 15 days later, on March 21, 2003, supports a finding of pretext. <u>See</u> <u>Plaintiff's Opposition</u> (Doc. #52) at 16.[20]   Temporal proximity may give rise to an inference of retaliation, but it is not sufficient standing alone to raise a genuine issue of fact as to pretext. <u>See</u> <u>Williamson v. Deluxe Fin. Servs., Inc.</u>, No. 03-2538-KHV, 2005 WL 1593603, at *8-9 (D. Kan. July 6, 2005).   In this case, plaintiff does not dispute that at the time she made the request on March 6, she was ineligible for FMLA leave.[21]   Defendant informed plaintiff of that fact, yet she did not report to work.   On this record,

---

[20]      Plaintiff also points out that Morris prepared an FMLA eligibility form on March 19, 2003. <u>Id.</u>

[21]      Although the Tenth Circuit has not addressed the issue, several courts have found that an employee cannot assert an FMLA retaliation claim if she was not eligible for FMLA leave at the time she made the request. <u>See</u> <u>Walker v. Elmore County Bd. of Educ.</u>, 379 F.3d 1249, 1252-53 (11th Cir. 2004) (plaintiff had not worked full year before leave was to begin); <u>Pennant v. Convergys Corp.</u>, 368 F. Supp.2d 1307, 1313 (S.D. Fla. 2005) (plaintiff had not worked requisite 1250 hours); <u>Schnoor v. Publ'ns Int'l, Ltd.</u>, No. 03-C-4972, 2005 WL 1651045, at *7 (N.D. Ill. July 5, 2005) (plaintiff had already taken 12 weeks at time of request); <u>Shafinsky v. Bell Atlantic, Inc.</u>, No. 01-2044, 2002 WL 31513551, at *9 (E.D. Pa. Nov. 5, 2002) (plaintiff had not worked requisite 1250 hours); <u>but see</u> <u>Carpenter v. Permanente</u>, No. 04-cv-1689, 2006 WL 2794787, at *16 (N.D. Ohio Sept. 27, 2006) (continued...)

18

plaintiff has not raised a genuine issue of material fact whether her request for FMLA leave – as opposed to her taking of unprotected leave – motivated defendant's decision to terminate her employment.

### 2.    Pattern Of Retaliatory Conduct

Plaintiff asserts that shortly after she took FMLA leave from August 13 to October 28, 2002, defendant began a pattern of adverse actions against her.  Specifically, plaintiff points to the fact that Morris called her into work on December 16, 2002, which resulted in plaintiff receiving two occurrences instead of one for her absence from August 13 to December 31, 2002.  Plaintiff asserts that those two occurrences formed part of the basis for her written reminder on March 1 and her termination on March 21, 2003.  See Plaintiff's Opposition (Doc. #52) at 17-18.

As an initial matter, plaintiff's evidence does not constitute a "pattern" of adverse action.  See Meiners v. Univ. of Kan., 239 F. Supp.2d 1175, 1196 (D. Kan. 2002).  She complains of only one incident – the fact that because Morris called her to work on December 16, 2002, she received two occurrences for her absence from August 13 to December 31, 2002 – and the consequences which supposedly resulted therefrom, i.e. that two occurrences formed part of the basis for her written reminder on March 1, 2003 and her termination on March 21, 2003.  Plaintiff has not shown, however, that the fact that she received two occurrences instead of one had any material affect on defendant's decisions to issue

---

[21](...continued)
(court not convinced that FMLA retaliation claim precluded because FMLA interference claim without merit).  These courts reasoned that a prima facie case of retaliation under the FMLA requires plaintiff to show that she engaged in statutorily protected activity, and plaintiff cannot do so if she was ineligible under the FMLA.  See Pennant, 368 F. Supp.2d at 1313; Schnoor, 2005 WL 1651045, at *7; Shafinsky, 2002 WL 31513551, at *9.  In this case, the Court need not decide the issue because plaintiff has not produced evidence sufficient to create a genuine issue of material fact whether defendant's stated reason for termination is pretextual.

a written reminder on March 1, 2003 and terminate her employment on March 21, 2003.  Defendant has

presented evidence that in deciding to terminate plaintiff's employment, it did not look merely to the number

of occurrences but also considered the length and reason for her absences.  On this record, plaintiff has not

shown a pattern of adverse action which would support a finding that defendant's stated reason for firing

her is pretextual.

**3.      Actions Contrary To Defendant's Written Policy**

Plaintiff contends that Morris violated the progressive discipline policy when she issued the

written reminder on December 16, 2002.  Specifically, plaintiff contends that because defendant had

deactivated her prior performance notice of May 30, 2002,[22] Morris should have started over at step one,

i.e. she should have issued a performance notice instead of a written reminder.  As an initial matter, the

record establishes that defendant withdrew the written reminder of December 16 during the union grievance

process, and plaintiff has not shown that the written reminder materially affected the termination decision

in any way.

Even if defendant relied on the written reminder, plaintiff has not shown that defendant contradicted

its written policy.  With respect to recurrence of a performance problem after a discipline action has been

deactivated, the discipline policy states as follows:

> Occasionally, a problem may reoccur in a deactivated performance category.  In some
> cases, the situation can be dealt with through an employee discussion.  If the problem
> warrants a step of discipline, generally, the employee will "start over" at Step 1
> (Performance Notice).  However, a manager is not required to start over at Step 1 if the
> situation is such that a more severe step of discipline, including dismissal, is appropriate.

---

[22]      On May 30, 2002, defendant issued plaintiff a performance notice for absences totaling
47 hours and 20 minutes.  On June 27, 2002, however, defendant deactivated the notice because plaintiff
had obtained FMLA approval for the absences.

20

All relevant factors, including the following, should be taken into account when determining which course of action to take:

    A.  seriousness of the performance problem;
    B.  length of time since deactivation;
    C.  chronic pattern of same or similar performance problems;
    D.  current active Performance Notices or Written Reminders; and
    E.  any mitigating or aggravating circumstances.

Defendant's Discipline Policy at 12.

Although defendant's policy provides that an employee will generally start over at step one, it does not require such a result. The policy specifically states that a manager is not required to start over if the situation is such that a more severe step of discipline is appropriate. The policy further provides that a manager may issue a written reminder when a single incident occurs which is serious enough to warrant it, regardless of any previous discipline. Defendant's Discipline Policy, Defendant's Exhibit C ¶ 3.3(B)(1)(c). Defendant maintains that Morris issued the written reminder because absenteeism was a recurrent problem with plaintiff. See Defendant's Reply (Doc. #57) at 14. At the time Morris issued the written reminder, plaintiff had been absent from work on unapproved leave for six weeks (from October 29 to December 15, 2002). Plaintiff has produced no evidence which suggests that her absence did not warrant a written reminder under defendant's policy. See Thompson v. Olsten Kimberly Qualitycare, Inc., 33 F. Supp.2d 806, 814-15 (D. Minn. 1999) (failure to follow progressive discipline not pretextual where plaintiff did not show that defendant afforded progressive discipline to similarly situated employees and manual stated that progressive discipline was not mandatory). As such, plaintiff has not produced evidence sufficient to demonstrate that defendant acted contrary to its written policy, or that written reminder of the December

21

16 somehow supports a finding that defendant's stated reason for firing her is pretextual.[23]

Plaintiff argues that defendant violated its written policy by firing her, in part, based on her absence on December 17, 2002, when her SW-9115 form stated that the absence was FMLA-approved.  The undisputed evidence establishes that Morris made the FMLA-notation in error and that plaintiff was not eligible for FMLA leave on that date.  Plaintiff speculates that defendant relied on the erroneous notation in deciding to terminate her, but she offers no evidence to support that assertion.  On this record, plaintiff has not shown that the erroneous notation supports a finding that defendant's stated reason for firing her is pretextual.

Plaintiff contends that Morris' phone call, which threatened that plaintiff would lose her job if she did not report to work by December 16, 2002, demonstrates pretext.[24]  Crawford testified that if Morris did make such a call, it was contrary to defendant's policy.  Not every policy violation, however, demonstrates pretext.  See, e.g., Randle, 69 F.3d at 454; Russell v. Vanguard Group, No. 04-3269, 2006 WL 2077010, at *3 (E.D. Pa. July 24, 2006); Poff v. Prudential Ins. Co. of Am., 911 F. Supp. 856, 861 (E.D. Pa. 1996).  Plaintiff must show that the alleged policy violation undermines defendant's stated reason for firing her.  See id.  On this record, plaintiff has not shown that the phone call – even if it was irregular – casts doubt on defendant's explanation that it fired plaintiff because of excessive absenteeism.

---

[23]    Plaintiff does not argue that defendant should not have issued a written reminder on February 6, 2003 in light of the fact that it had deactivated the performance notice of May 30, 2002. To the extent plaintiff might make such an argument, the same analysis applies.

[24]    Plaintiff asserts that the phone call constitutes a "disturbing procedural irregularity," but she couches her argument in terms that it was contrary to defendant's policy.  See Plaintiff's Opposition (Doc. #52) filed October 23, 2006.  Regardless of the label, the phone call does not show that defendant's stated reason for firing plaintiff is pretextual.

Plaintiff contends that Crawford violated company custom and practice when he terminated her employment during a telephone conference.  Again, even if the action violated defendant's custom and practice, plaintiff has not shown that the violation undermines the stated reason for terminating her.  As such, plaintiff has not demonstrated a triable issue regarding pretext.

### 4.  Subjective Criteria

Plaintiff contends that the fact that defendant used subjective criteria under its absentee policy supports a finding of pretext.  Specifically, plaintiff points to policy language that "[t]here is no absolute mathematical standard for determining good or bad attendance."  Plaintiff also points to defendant's practice of deciding whether to terminate an employee on a case-by-case basis.  Plaintiff argues that the fact that defendant's policy allows subjective decision-making provides an opportunity for unlawful discrimination.

In support of her argument, plaintiff cites Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1218 (10th Cir. 2002).  That case involved subjective performance rankings which took an abrupt turn for the worse almost immediately after plaintiff began organizing a pro-diversity committee at the workplace.  The Tenth Circuit found that absent evidence that the ranking system relied on objective criteria, plaintiff had satisfied his burden to demonstrate pretext.  See id. at 1218.  More recently, in Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186 (10th Cir. 2006), the Tenth Circuit stated that while the use of subjective criteria may be relevant to the pretext determination, it ordinarily is not sufficient in itself to establish pretext. Id. at 1195.  Both of those cases involved the use of subjective criteria in the context of evaluating employee performance.  Plaintiff has cited no case – and the Court is aware of none – which supports that a finding of pretext can be based on the mere fact that an employer's absentee policy allows a manager discretion

23

in deciding whether to terminate an employee.

### 5.    Inconsistent Explanations

Plaintiff asserts that defendant has given inconsistent explanations regarding the precise dates of the five occurrences in 2002 which formed part of the basis for the termination decision. Specifically, plaintiff points to the fact that in her deposition, Morris testified that the five occurrences occurred on the following dates in 2002: (1) January 31; (2) February 14 through 18; (3) August 3; (4) October 29 through December 16; and (5) December 17 through 31.  Plaintiff contrasts this with the testimony of Crawford, who identified the following dates: (1) January 31; (2) February 14; (3) June 3; (4) August 3; and (5) December 17.  Plaintiff asserts that the inconsistencies demonstrate that defendant is attempting to cover up a discriminatory purpose.  See Plaintiff's Opposition (Doc. #52) at 20.

On this record, plaintiff has not shown that the deposition discrepancies are probative of pretext. As an initial matter, the record yields no inference that Crawford was responsible for compiling dates of occurrences, and the Court cannot discern what information he had available at the time of his deposition. Moreover, plaintiff does not dispute that in 2002, defendant assessed her five occurrences.  The fact that one of the witnesses may have been mistaken as to the precise dates of the occurrences does not support a finding of pretext.  See Williams v. Potter, 331 F. Supp.2d 1331, 1345 (10th Cir. 2004) (mistake not evidence of intentional discrimination).

To show pretext, plaintiff must produce evidence which demonstrates a genuine issue of fact whether defendant's stated reason for the termination – excessive absenteeism – is a fabrication designed to conceal an unlawful reason.  See Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 684 (7th Cir. 2000).  A pretext for discrimination means more than an unusual act; it means something worse

24

than a business error; pretext means deceit used to cover one's tracks.  See id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2108-09 (2000)).  On this record, plaintiff has not produced evidence sufficient to create a genuine issue of material fact as to whether defendant's stated reason for the discharge is pretextual.

**III.    Mixed Motives Theory**

Plaintiff contends that she can overcome summary judgment under a mixed-motive theory of retaliation.  In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), a Title VII gender discrimination case, the United States Supreme Court found that when plaintiff challenges an employment decision that may have been the product of a mixture of legitimate and illegitimate motives, i.e. mixed motives, she need not squeeze her proof into the McDonnell Douglas burden-shifting framework.  Id. at 246-47.  Rather, the Supreme Court held that once plaintiff shows that an improper motive played a motivating part in an employment decision, defendant may avoid liability if it proves that it would have made the same decision despite the improper motive.  Id. at 244-45.[25]  After Price Waterhouse, many courts required that plaintiffs present direct evidence of discrimination to proceed on a mixed-motive theory.  See, e.g., Mohr v. Dustrol, Inc., 306 F.3d 636, 640-641 (8th Cir. 2002); Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (11th Cir. 1999); Trotter v. Bd. of Trustees of Univ. of Ala., 91 F.3d 1449, 1453-54 (11th Cir. 1996);

---

[25]    The Civil Rights Act of 1991 overruled Price Waterhouse to the extent that decision held that an employer could avoid liability under Title VII by proving it would have taken the same action absent the unlawful motive.  See 42 U.S.C. § 2000e-2(m).  The amended statute merely restricts plaintiff's remedies – as opposed to absolving liability altogether – if defendant shows that it would have taken the same action absent the unlawful motive.  See 42 U.S.C. § 2000e-5(g)(2)(B).

<u>Fuller v. Phipps</u>, 67 F.3d 1137, 1142 (4th Cir. 1995).[26]  In <u>Desert Palace, Inc. v. Costa,</u> 539 U.S. 90, 101 (2003), however, the Supreme Court clarified that a plaintiff could proceed on mixed-motive theory with only circumstantial evidence.

While <u>Price Waterhouse</u> and <u>Desert Place</u> involved Title VII claims, some courts including the Tenth Circuit have applied the mixed-motive analysis to FMLA retaliation claims.  <u>See</u> <u>Tujillo-Cummings v. Pub. Serv. Co. of N.M.</u>, No. 97-2337, 1999 WL 169336, at *5 (10th Cir. March 29, 1999) (FMLA retaliation claim could not survive summary judgment where plaintiff presented no direct or circumstantial evidence that alleged retaliatory motive related to question of discrimination in particular employment decision); <u>Richardson v. Monitronics Int'l, Inc.</u>, 434 F.3d 327, 334-35 (5th Cir. 2005); <u>but</u> <u>see</u> <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d 161, 176 (2d Cir. 2006) (not deciding whether to adopt mixed-motive test for FMLA retaliation claim); <u>Colburn v. Parker Hannifin/Nichols Portland Div.</u>, 429 F.3d 325, 336 (1st Cir. 2005) (not resolving open question whether mixed-motive analysis available in FMLA retaliation case).

Here, plaintiff has not presented evidence sufficient to create a genuine issue of material fact whether a retaliatory motive played a motivating part in the termination decision.   Plaintiff cites two pieces of circumstantial evidence.  First, she points to the fact that defendant gave her a performance notice on May 30, 2002, based on two occurrences which the FMLA covered.  Plaintiff acknowledges that defendant subsequently deactivated the notice, but she contends that Morris should have started over at step one when she assessed the written reminder on December 16, 2002.  As noted, defendant's policy specifically

---

[26]      The Tenth Circuit, however, stated that plaintiffs could proceed on a mixed-motive theory with direct or circumstantial evidence.  <u>See</u>, <u>e.g.</u>, <u>Medlock</u>, 164 F.3d at 550.

states that a manager is not required to start over if the situation is such that a more severe step of discipline is appropriate. The policy further provides that a manager may issue a written reminder when a single incident occurs which is serious enough to warrant it, regardless of any previous discipline. Defendant's Discipline Policy, Defendant's Exhibit C ¶ 3.3(B)(1)(c). At the time Morris issued the written reminder, plaintiff had been absent from work on unapproved leave for six weeks. Plaintiff has produced no evidence which suggests that such an absence did not warrant a written reminder under defendant's policy. As such, plaintiff has not shown a genuine issue of fact as to whether the performance notice demonstrates that retaliation played a motivating factor in the termination decision.

Second, plaintiff asserts that because her SW-9115 form states that FMLA covered her absence on December 17, 2002, a reasonable jury could find that the termination was directly based on absences which involved the exercise of her FMLA rights. The undisputed evidence establishes that Morris made the FMLA notation in error, however, and that plaintiff was not eligible for FMLA leave. Plaintiff cites no evidence that defendant relied on the erroneous notation in deciding to terminate her employment. Indeed, the synopsis which Morris prepared days before the termination clearly states that plaintiff ran out of FMLA on October 28, 2002. See Deposition Exhibit 17, appendix to Plaintiff's Opposition (Doc. #52). On this record, plaintiff has not shown a genuine issue of fact whether the erroneous notation demonstrates that retaliation played a motivating factor in the termination decision.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Partial Summary Judgment [On Plaintiff's FMLA Claim] (Doc. #48) filed September 22, 2006 be and hereby is **SUSTAINED.** The Court grants summary judgment in favor of defendant on plaintiff's claim under the FMLA. Plaintiff's claim under ERISA remains in the case. The Court is inclined to remove this case from the trial calendar of February 6,

2007.  The parties may raise any objection thereto at the status conference on January 30, 2007.

**IT IS FURTHER ORDERED** that <u>Plaintiff's Motion For Leave To File A Surreply</u> <u>Memorandum In Opposition To Defendant's Motion For Summary Judgment</u> (Doc. #58) filed December 1, 2006 be and hereby is **SUSTAINED.**

Dated this 29th day of January, 2007 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
Kathryn H. Vratil
United States District Judge