## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KAREN BURNETT,                                   )
                                                 )
                  **Plaintiff,**      )
                                                 )          **CIVIL ACTION**
**v.**                                           )
                                                 )          **No. 05-2514-KHV**
SOUTHWESTERN BELL TELEPHONE, L.P.,               )
                                                 )
                  **Defendant.**      )
_____)

### MEMORANDUM AND ORDER

Karen Burnett brings suit against Southwestern Bell Telephone, L.P. for retaliatory discharge in violation of the Family and Medical Leave Act, 29 U.S.C. § 2611 et seq. ("FMLA"), and the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA").  On January 29, 2007, the Court granted defendant's motion for partial summary judgment on the FMLA claim. This matter is before the Court on Plaintiff's Motion For Reconsideration (Doc. #73) and defendant's Motion For Summary Judgment (Doc. #71), both filed February 8, 2007.  For reasons stated below, the Court overrules plaintiff's motion for reconsideration and sustains defendant's motion for summary judgment.

**I.     Plaintiff's Motion For Reconsideration**

    **A.     Legal Standards**

The Court has discretion whether to grant or deny a motion to reconsider.  Hancock v. City of Okla. City, 857 F.2d 1394, 1395 (10th Cir. 1988).  The Court may recognize any one of three grounds justifying reconsideration: an intervening change in controlling law, availability of new evidence, or the need to correct clear error or prevent manifest injustice.  Major v. Benton, 647 F.2d 110, 112 (10th Cir. 1981); Burnett v. W. Res., Inc., 929 F. Supp. 1349, 1360 (D. Kan. 1996).  A

motion to reconsider is not a second opportunity for the losing party to make its strongest case, to rehash arguments, or to dress up arguments that previously failed. <u>Van Skiver v. United States</u>, 952 F.2d 1241, 1243 (10th Cir. 1991).

> **B.      Analysis**

Plaintiff asks the Court to reconsider its order granting summary judgment in favor of defendant on plaintiff's FMLA claim.  Specifically, plaintiff argues that in granting summary judgment, the Court misapprehended her position on two issues.  First, plaintiff contends that the Court may have misunderstood her position that close temporal proximity in combination with the use of subjective criteria is sufficient to show pretext.  Second, plaintiff asserts that in ruling against plaintiff on her mixed motives theory, the Court may have overlooked the deposition testimony of Jason Crawford.

> **1.      Pretext**

Plaintiff contends that the Court may have misunderstood her position that close temporal proximity in combination with the use of subjective criteria is sufficient to show pretext. The portion of the Court's summary judgment order which discussed pretext followed the same structural outline as plaintiff's memorandum in opposition to summary judgment.  <u>Compare Memorandum And Order</u> (Doc. #68) filed January 29, 2007 at 18-25, <u>with</u> <u>Memorandum In Opposition To Motion For Partial Summary Judgment</u> ("<u>Plaintiff's Opposition</u>") (Doc. #52) filed October 23, 2006 at 16-20.  Specifically, the Court separately addressed six pieces of circumstantial evidence and concluded that plaintiff had not produced evidence sufficient to demonstrate a genuine issue of fact as to pretext.  <u>See</u> <u>Memorandum And Order</u> (Doc. #68) at 18-25.

As to timing, plaintiff argued that the close proximity between the time when she requested

FMLA leave on March 6, 2003, and the time of her termination on March 21, 2003, supported a finding of pretext. See Plaintiff's Opposition (Doc. #52) at 16. Here, plaintiff was ineligible for FMLA at the time of her request and took unprotected leave anyway, after defendant informed her of her ineligibility. The Court found that on these facts, plaintiff had not demonstrated a genuine issue of material fact whether defendant fired her because she requested FMLA leave. See Memorandum And Order (Doc. #68) at 18-19.

As to subjective criteria, plaintiff argued that defendant's use of subjective criteria under its absentee policy supported a finding of pretext. See Plaintiff's Opposition (Doc. #52) at 19-20. The Court found that the fact that defendant's absentee policy allowed a manager discretion in deciding whether to terminate an employee did not demonstrate a genuine fact issue as to pretext. See Memorandum And Order (Doc. #68) at 23-24.

Plaintiff asserts that the Court erred in not considering the timing of her termination in conjunction with defendant's use of subjective criteria. Although the Court did not specifically so state in its order, it considered all of plaintiff's evidence in determining that plaintiff had not produced evidence sufficient to demonstrate a triable issue of fact as to pretext. Specifically, the fact that 15 days before her termination plaintiff requested FMLA leave for which she was not eligible, and the fact that defendant used subjective criteria in making its termination decision, does not demonstrate a genuine issue of material fact whether defendant's stated reason for the discharge – excessive absenteeism – was pretextual. The Court therefore overrules plaintiff's motion to reconsider on this issue.

### 2. Mixed Motives Theory

In opposing summary judgment, plaintiff argued that because her SW-9115 form erroneously

stated that FMLA covered her absence on December 17, 2002, a reasonable jury could find that defendant terminated her based on absences which involved the exercise of FMLA rights.  See Plaintiff's Opposition (Doc. #52) at 14.  The Court found that plaintiff had not cited evidence which showed that in deciding to terminate her employment, defendant had relied on the erroneous notation. See Memorandum And Order (Doc. #68) at 27.

Plaintiff argues that in reaching its conclusion, the Court may have overlooked the deposition testimony of her supervisor, Jason Crawford.  Crawford testified that (1) plaintiff's SW-9115 form indicated that her absence on December 17, 2002 was FMLA-approved,[1] see Crawford Depo. at 117:14-118-4, Exhibit D to Memorandum In Support Of Motion For Partial Summary Judgment (Doc. #49) filed September 29, 2006; (2) in deciding whether to discipline an employee, he would typically review the employee's SW-9115 form and rely on Teresa Morris (manager of the consumer sales acquisition center) to explain the form to him, see id. at 81:16-82:19; (3) in deciding whether to discipline plaintiff, he and Morris reviewed her SW-9115 form, see id. at 86:12-22; and (4) in deciding whether to recommend discharging plaintiff, he would have reviewed her SW-9115 form along with other documents, see id. at 182:7-23.

As an initial matter, the record establishes that it was Angela Ross (director of the consumer sales acquisition center) – not Crawford – who made the termination decision.  Crawford testified that although he typically consulted with Ross and recommended to her whether to fire an employee under his supervision, he does not remember doing so in this case.  See Crawford Depo. at 171:23-173:25.  Moreover, even if Crawford recommended discharging plaintiff, his deposition testimony does not show that he relied on the FMLA notation on plaintiff's SW-9115 form in making such

---

[1]        The parties agree that the FMLA notation is erroneous.

recommendation.  Crawford testified merely that he reviewed the form and that he would have relied on Morris to explain it to him.  On March 10, 2003, Morris e-mailed Crawford a synopsis of plaintiff's attendance and discipline record.  The synopsis stated that on October 28, 2002, plaintiff ran out of FMLA leave on and that on December 17, 2002, she relapsed on her disability.  <u>See</u> <u>Memorandum And Order</u> (Doc.#68) at 10-11.  Thus, as of March 10, 2003, Morris was clearly aware that plaintiff's absence on December 17 was not protected by FMLA, and Crawford had the same information before him.  On this record, plaintiff has not produced evidence sufficient to demonstrate a genuine issue of material fact whether Crawford decided to terminate her employment based in part on the erroneous FMLA notation on her SW-9115 form.  Plaintiff's motion for reconsideration is therefore overruled.

## II.      Defendant's Motion For Summary Judgment

### A.       Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>accord</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  <u>Anderson</u>, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hicks v. City of Watonga</u>, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the

nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,</u> 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see</u> <u>also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,</u> 475 U.S. 574, 586-87 (1986); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.,</u> 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on his pleadings but must set forth specific facts. <u>Applied Genetics,</u> 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,</u> 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. <u>Anderson,</u> 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." <u>Conaway v. Smith,</u> 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson,</u> 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Rule 56(e) also requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith." To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards those portions which are not shown to be based upon personal knowledge or otherwise do not comply with Rule 56(e). <u>Maverick Paper Co. v. Omaha Paper Co.,</u> 18 F. Supp.2d 1232, 1234-35

(D. Kan. 1998).

### B.      Facts

The following facts are either uncontroverted or, where controverted, construed in the light most favorable to plaintiff:

#### 1.      Defendant's Attendance Policy

Defendant's policy requires "good attendance and punctuality."  Operating Practice No. 45, Defendant's Exhibit B  ¶  1.2.   The  policy  states  that  "[g]ood  attendance  means  a demonstrated ability to be on the job on time over sustained periods of time."  Id.  The policy provides that

> [t]here is no absolute mathematical standard for determining good or bad attendance. The determination of whether a particular employee's attendance is satisfactory or not is made on an individual basis, taking into account all of the relevant factors pertaining to each employee's attendance record.

Id. ¶ 1.3.  Under the policy, defendant does not discipline employees for FMLA-approved absences and does not consider such absences when deciding whether to fire an employee.

#### 2.      Defendant's Discipline Policy

Defendant maintains a progressive discipline policy.  Southwestern Bell Telephone Company Positive Discipline Policy and Procedure ("Discipline Policy"), Defendant's Exhibit C. The  policy  provides  that  defendant  will  accomplish  most  performance  improvement  through recognition of good performance or employee discussions.  Id. ¶ 3.3.  Where discipline is required, the policy sets forth three progressive levels.  Most cases begin at level one with a "performance notice."   Id. ¶ 3.3(A).   At this level, the supervisor and employee discuss the job performance problem; the supervisor informs the employee that defendant expects improvement and indicates what consequences will result if the employee does not improve.  Id. ¶ 3.3(A)(1).  A  performance

notice remains active for six months, and an employee may have one active performance notice in each performance category.[2] Id. ¶ 3.3(A)(3)(c).  If a problem continues within the same performance category, or if the employee has three active performance notices in any categories, the employee must progress to the next higher level of discipline.  Id.

The second level of discipline is a "written reminder," which documents a formal conversation between a supervisor and employee about a "very serious" performance problem.  Id. ¶ 3.3(B).  The supervisor follows up with a written reminder to the employee which summarizes the conversation.  Under the policy, defendant issues a written reminder when (1) an employee's performance has not met job requirements during the six-month active time period for a performance notice; (2) an employee already has three active performance notices in separate categories; or (3) a single incident occurs which is serious enough to warrant a written reminder, regardless of previous discipline.  Id. ¶ 3.3(B)(1).  A written reminder remains active for nine months, and an employee may have only one written reminder active in any one performance category.  Id. ¶ 3.3(B)(3)(d).  If problems continue within the same performance category, or if the employee has two written reminders in different performance categories, the employee must progress to the next higher level of discipline.  Id.

The third level of discipline is a "decision making leave" ("DML"), which begins with a formal discussion between a supervisor and employee about an "extremely serious" performance problem which can result in dismissal.  Id. ¶ 3.3(C).  The discussion typically occurs just before the end of the employee's shift.  The supervisor informs the employee of the seriousness of the situation and asks the employee whether he or she can commit to meet all job requirements.  At the end of the

---

[2]    Although the record is not clear, it appears that the policy covers three performance categories: (1) measurement of work, (2) attendance/punctuality and (3) safety.  Id. ¶ 2.1.

discussion, the supervisor places the employee on DML with pay for the following scheduled work day.[3]  Upon returning the next scheduled work day, the employee must report to the supervisor whether he or she can commit to meet all job requirements.  If not, the employee may resign.  Id. Under the policy, defendant applies a DML when (1) an employee has not achieved and maintained job performance requirements during the nine-month active time period for a written reminder; (2) an employee already has two active written reminders in separate categories; or (3) an employee commits an "extremely serious offense," regardless whether previous discipline has occurred.  Id. ¶ 3.3(C)(1).  A DML remains active for 12 months, and an employee may have only one active DML at a time.  Id. ¶ 3.3(C)(3)(d).  If an employee commits an infraction while a DML is active, the immediate supervisor must document the infraction and forward an appropriate recommendation to the next two higher levels of management.  Id. ¶ 3.3(C)(3)(e).  The policy further provides that "[i]f the infraction is not deemed worthy of dismissal, the documentation will be covered with the employee and placed in the employee's personnel file."  Id.

If a problem recurs after a discipline action is no longer active, the policy provides as follows:

> Occasionally, a problem may reoccur in a deactivated performance category.  In some cases, the situation can be dealt with through an employee discussion.  If the problem warrants a step of discipline, generally, the employee will "start over" at Step 1 (Performance Notice).  However, a manager is not required to start over at Step 1 if the situation is such that a more severe step of discipline, including dismissal, is appropriate.  All relevant factors, including the following, should be taken into account when determining which course of action to take:
> A. seriousness of the performance problem;
> B. length of time since deactivation;
> C. chronic pattern of same or similar performance problems;

---

[3]      If an employee receives a DML which is subsequently deactivated, defendant ordinarily does not give the employee another paid day off if it issues another DML to that employee.

    D.  current active Performance Notices or Written Reminders; and

    E.  any mitigating or aggravating circumstances.

<u>Id.</u> ¶ 4.2.

### 3.    Plaintiff's Employment With Defendant

In August of 1996, plaintiff began working as a part-time customer service representative for defendant.  On November 1, 1999, she became a full-time employee.  At all relevant times, plaintiff understood defendant's attendance policies and expectations.

Jason Crawford was plaintiff's area manager, Angela Ross directed the consumer sales acquisition center and Teresa Morris managed the consumer sales acquisition center.  Morris' duties included gathering information concerning employee attendance, calculating hours worked and tracking hours used under the FMLA.  In performing such duties, Morris maintained a so-called "SW-9115 " form which tracked when an employee missed work, the reason for the absence and whether it was covered by the FMLA.[4]

On May 30, 2002, defendant issued plaintiff a performance notice for absences totaling 47 hours and 20 minutes.[5]  Nearly a month later, on June 27, 2002, defendant deactivated the notice because FMLA covered the triggering events for the notice.  In deactivating the notice, Morris

---

[4]    If an employee satisfies FMLA eligibility requirements, he or she can use 480 hours of FMLA leave during each calendar year.  To calculate eligibility for FMLA leave with respect to the requisite number of hours worked, defendant looks back 12 months from the first day of the leave-triggering event.

    Plaintiff contends that the SW-9115 form also tracked whether an absence was "covered by" disability benefits.  <u>See</u> <u>Memorandum In Opposition To Motion For Partial Summary Judgment</u> ("<u>Plaintiff's Memorandum</u>") (Doc. #76) filed March 5, 2007 ¶ 28.  Plaintiff cites no sworn testimony to support this assertion, however, and the Court is unable to so conclude by viewing the document alone.

[5]    The record does not reflect the number of occurrences which plaintiff received for the absences.

advised plaintiff as follows:

> This is to notify you I will be deactivating you[r] Performance notice for attendance due to you getting the 2 occurrences 5/11-5/13/2002 and 4/23/-5/2/5/2002 FMLA approved.  This was the agreement I had made during the performance notice meeting.

Defendant's Exhibit G.

From June 3 through June 8, 2002, plaintiff missed work due to the death of her mother-in-law.  Although its funeral leave policy did not apply, defendant allowed plaintiff to take the days off without discipline.

On August 3, 2002, plaintiff again missed work.  The FMLA did not protect this absence because plaintiff did not provide a medical certification.

Beginning August 13, 2002, plaintiff stopped work due to post-traumatic depression and stress.  The FMLA protected plaintiff's absence until October 28, 2002, when she exhausted her available FMLA leave for the calendar year.  Plaintiff did not report to work, however, after her FMLA leave expired.

Beginning August 20, 2002, plaintiff received short-term disability payments which continued through December 15, 2002.

On December 9, 2002, Morris called plaintiff and told her that she would lose her job if she did not report to work by December 16, 2002.  In so doing, Morris acted contrary to defendant's typical practice, which is to let the employee decide whether and when to return to work.

On December 16, 2002, plaintiff reported to work.[6]  Morris held an attendance discipline meeting and gave plaintiff a written reminder for unsatisfactory attendance.  Because she still

---

[6]     The parties dispute whether plaintiff returned to work on December 16 or 17.  For purposes of this ruling, the Court accepts plaintiff's assertion that it was December 16.

suffered from post-traumatic depression and stress, plaintiff left work after an hour and did not return until January 20, 2003.[7]

From December 17 through December 31, 2002, plaintiff received short-term disability payments.[8]

On January 20, 2003, plaintiff returned to work on a half-day schedule.  On January 27, 2003, she increased to six hours a day, and on February 3, 2003, she resumed full-time employment.  The FMLA covered plaintiff's absence from January 1, 2003 to February 1, 2003.

On February 6, 2003, Morris held a DML meeting with plaintiff because the FMLA did not protect plaintiff's absence from December 17 to 31, 2002, and she had therefore incurred additional unprotected absences after the written reminder of December 16, 2002.[9]  Pursuant to the DML, defendant gave plaintiff a paid day off on February 8, 2003, to decide whether she could adhere to its attendance requirements.[10]  Plaintiff asked whether Morris was overstepping the performance

---

[7]     The FMLA did not cover plaintiff's absence from December 17 through 31, 2002. Plaintiff's SW-9115 for 2002 indicates that the absence on December 17, 2002 was FMLA-approved, but Morris contends that she made the notation in error and the record contains no contrary evidence on this point.  See Affidavit Or Teresa Morris ¶ 3, Exhibit A to Defendant's Reply To Plaintiff's Memorandum In Opposition To Motion For Partial Summary Judgment ("Defendant's Reply") (Doc. #57) filed November 15, 2006.  As noted, plaintiff exhausted her FMLA leave for 2002 on October 28, 2002.  Because defendant uses a calendar year to calculate FMLA leave availability, FMLA began covering plaintiff's absence again on January 1, 2003.

[8]     Although the record is not clear, it appears that plaintiff's disability payments ceased on December 31, 2002.

[9]     According to Morris, plaintiff received two occurrences for the time period from August 13 to December 31, 2002, because she reported to work on December 16 and therefore her absence was not continuous.

[10]     When defendant placed plaintiff on DML, it informed her that for the next 12 months, she must maintain satisfactory performance in all areas of her job, including attendance.  Plaintiff understood that she could be fired if she failed to meet these requirements.

notice (step one of the discipline policy).  Morris replied that defendant did not start over on positive discipline for attendance.

Plaintiff filed a union grievance regarding the DML of February 6, 2003.  As a result of the grievance, defendant removed the written reminder of December 16, 2002 and reduced the DML of February 6, 2003 to a written reminder.  Defendant took these actions because Rob Semon, in human resources, said that he would not support management moving plaintiff two levels of positive discipline for absences due to the same disability.  In other words, he believed that management should not have issued both a written reminder and DML for plaintiff's absence from October 28, 2002 to January 20, 2003, because it was due to one disability (post-traumatic depression and stress).

On February 24, 2003, plaintiff missed work for unexplained reasons.[11]  Because of this absence, on March 1, 2003, defendant held a second DML meeting and informed plaintiff that any subsequent attendance problems could result in termination.

On March 6, 2003, plaintiff telephoned work and told Morris that she was having difficulty breathing and did not feel well.[12]  Morris stated that plaintiff had six hours of vacation time available.[13]  Plaintiff informed Morris that her doctor had told her to go to the hospital.  Morris told plaintiff that she needed to do what her doctor advised.  Plaintiff did not report to work on that day or any day thereafter.

On March 10, 2003, Morris e-mailed Crawford (plaintiff's area manager) and Ross (director

---

[11]     Plaintiff does not know why she missed work on February 24, 2003.  She does not believe that she requested FMLA coverage for this absence, and she does not contend that she was eligible for FMLA leave at that time.

[12]     Plaintiff suffered a pulmonary embolism, a condition unrelated to her prior post-traumatic depression and stress.

[13]     Plaintiff does not dispute that she was not eligible for FMLA leave.

of the consumer sales acquisition center) the following synopsis of plaintiff's attendance and

discipline in 2002 and 2003:

- **Performance Notice** on 5/30/02 . . . deactivated 6/27/2003 due to triggering events being covered by FMLA.

- Karen had an absence on 6/3 and 6/8/02 which was connected to her mother-in-law passing. No action was taken.

- 8/3/2002 – Karen called in ill – filed FMLA – did not get final denial until 11/14/2002 – Karen was out on disability at that time – no action taken.

- 8/13/2002 – went out on disability.

- 10/28/02 – ran out of FMLA.

- 12/16/02 return to work – placed employee on **written reminder** for attendance due to 10/28–12/16 not being FMLA covered and employee had not demonstrated she could be at work for a substantial period of time.

- 12/17/02 – Karen relapsed on disability.

- Returned on 2/3/03 – progressed to a **DML** for attendance on 2/6/2003, for unprotected disability time after relapsing on 12/17/2002.

- Union filed grievance.

- Jason denied written reminder.

- Grievance went to Rob Semon. Union advised Rob that Karen had been progressed to a DML.

- Rob Semon recessed grievance and advised he would not support us moving 2 levels of positive discipline on the same disability even though she returned and went back out.

- Karen had another absence on 2/24/2003 for a full day. I contacted Rob to find out what action should be taken since we were in the middle of the grievance process. Rob advised I should hold an employee discussion with Karen addressing the absence and advising her I would be getting back to her. I held that discussion on 2/27/2003.

- Rob contacted Debbie Snow on 2/27/2003 and they agreed to remove the

written reminder on 12/16/02 to resolve the grievance.

- Rob advised that would [sic] change the DML on 2/6/2003 to a written reminder.  Karen had already received a DML day on 2/8/2003 so she was not given another DML day off with pay when she was progressed back to a DML on 3/1/03 for the 2/24/03 absence.

- Karen then called in on 3/6/03 and begged for a vacation day.  I advised there were only 6 hours and she would have to come in from 5-7.  Karen took a 6 hour EWP.[14]  I then received a call from an emergency room nurse advising Karen Burnett had been admitted into the hospital and that Karen had ask[ed] her to call me and let me know she would not be there at 5:00 p.m.

- Karen has not returned to work since 3/6/03.  She has called in every day from the hospital.

- Karen is not FMLA eligible due to not working 1250 hours in the last 12 months.

- As of today, Karen has 7 occurrences for 424 hours and 25 minutes.

Deposition Exhibit 17, appendix to Plaintiff's Opposition (Doc. #52) (emphasis in original).  When Crawford read the e-mail, he knew that plaintiff was in the hospital and that she might apply for short-term disability benefits.

Beginning March 13, 2003 plaintiff received short-term disability benefits which continued through May 4, 2003.[15]

On March 19, 2003, Morris prepared an FMLA eligibility form regarding plaintiff's absence beginning March 6, 2003.  The form stated that "employee is not eligible for FMLA time due to not working 1250 hours."  Deposition Exhibit 15 at 2, appendix to Plaintiff's Opposition (Doc. #52).

Some time after March 19, 2003, Morris began working on a separation proposal for

---

[14]    The record does not explain what an "EWP" is.

[15]    Defendant agrees that plaintiff received the benefits pursuant to and in accordance with its plan.  See Defendant's Reply To Plaintiff's Memorandum In Opposition To Motion For Summary Judgment (Doc. #77) filed March 13, 2007 ¶ 39.

plaintiff.[16]  With regard to plaintiff's attendance record, Morris reported that in 2002, plaintiff had

five occurrences totaling 403 hours and 55 minutes, and that in 2003, plaintiff had two occurrences

totaling 89 hours.[17]  See Deposition Exhibit 19, appendix to Plaintiff's Opposition (Doc. # 52).

On March 21, 2003, Crawford called plaintiff at home and told her that defendant was

terminating her employment effective that day for unsatisfactory attendance.  Plaintiff asked about

her disability benefits.  Crawford replied that as long as she was out on a certified disability, she

would still receive disability benefits.

Ross had ultimate authority to decide whether to discharge an employee.  In so doing, she

typically relied on direct supervisors to provide accurate information, and she sometimes asked

questions and reviewed documentation with them.  Ross states that she decided to terminate plaintiff

after conducting "a thorough investigation concerning her absenteeism, including, but not limited

to, reviewing [plaintiff's] positive discipline records, attendance records, and documentation of

employee discussions."  Affidavit Of Angela Ross ¶ 3, Exhibit B to Defendant's Reply (Doc. #57).

Crawford typically recommended to Ross whether she should fire an employee under his

---

[16]     Morris testified that Crawford directed her to prepare the document, but she does not
recall when he did so.  See Morris Depo. at 192:11-193:5, Defendant's Exhibit E.  She printed and
signed the document on April 7, 2003.  Id. at 192:2-6.

[17]     Defendant's attendance policy defines an occurrence as a continuous period of
absence.  For 2002, defendant counted five occurrences on the following dates: (1) January 31;
(2) February 14 to 18; (3) August 3; (4) October 29 to December 16; and (5) December 17 to 31.
For 2003, defendant counted two occurrences: (1) February 24; and (2) March 6 through 21 (the date
of termination).
       For the time period from August 13 through December 31, 2002, defendant assigned plaintiff
two occurrences of unprotected leave (i.e. non-FMLA-covered leave).  If plaintiff had not returned
to work on December 16, 2002 defendant would have charged her with only one occurrence for a
continuous period of absence from October 29 through December 31, 2002.  Because plaintiff
reported to work on December 16, however, defendant assigned her two occurrences: one for
October 29 to December 16, 2002, and another for December 17 through 31, 2002.

16

supervision. In this case, however, Crawford does not recall making such a recommendation. Crawford nevertheless testified that Ross would have consulted him about the decision. <u>See</u> Crawford Depo. at 173:22-25, 175:20-176:1. Crawford also testified that in making a recommendation to Ross, he would have considered many factors, including the fact that plaintiff might be on disability or have applied for disability, but he did not recall how that would have factored into his recommendation. <u>See</u> <u>id.</u> at 176:2-13.

When an employee is absent after being placed on DML, defendant does not automatically discharge the employee. Rather, it decides whether to terminate the employee on a case-by-case basis, based on relevant factors including the number and frequency of absence, the reason for the absence, the employee's past history of absence, the amount of time lost, the employee's attitude toward maintaining satisfactory attendance, the prognosis of future attendance and whether FMLA covers the absence. <u>See</u> Defendant's Exhibit B at 2-3. In deciding to terminate plaintiff, defendant did not look merely to the number of plaintiff's occurrences; it also considered the length and reason for her absences.

### C.    Analysis

Plaintiff claims that defendant terminated her employment in retaliation for her seeking short-term disability benefits. Defendant asserts that it is entitled to summary judgment because (1) under the law of the case doctrine, the Court's previous order granting summary judgment on plaintiff's FMLA retaliation claim requires the same ruling on her ERISA retaliation claim; and (2) under the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973), and <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-56 (1981), plaintiff cannot show a prima facie case or pretext. Plaintiff disagrees and contends that the evidence supports a prima facie case

17

and a finding of pretext.  In addition, plaintiff argues that she has presented evidence sufficient to demonstrate a triable issue under a "mixed motive" theory.

### 1.      Law Of The Case

Defendant contends that based on the law of the case doctrine, the Court's previous order granting summary judgment on plaintiff's FMLA retaliation claim mandates an identical ruling on her ERISA retaliation claim.  Generally, once a court decides an issue, the parties may not re-litigate the same issue in subsequent proceedings in the same case.  Grigsby v. Barnhart, 294 F.3d 1215, 1218 (10th Cir. 2002).  Unlike res judicata, however, the law of the case doctrine is not an "inexorable command," but should be applied with good sense.  United States v. Monsisvais, 946 F.2d 114, 117 (10th Cir. 1991) (quoting Major, 647 F.2d at 112).  Here, the Court's previous order decided the issue whether plaintiff had presented evidence sufficient to demonstrate a triable fact issue whether defendant terminated her employment in retaliation for her exercise of rights under the FMLA.  Defendant's present motion addresses a different issue – whether plaintiff can present evidence sufficient to demonstrate a triable fact issue whether defendant terminated her employment in retaliation for her exercise of rights under ERISA.  Because the issues presented are not the same, the law of the case doctrine does not apply.  Defendant's motion is therefore overruled in this regard.

### 2.      McDonnell Douglas Burden-Shifting Framework

Plaintiff claims that defendant terminated her employment because she sought short-term disability benefits to which she was entitled.  Section 510 of ERISA provides in part that:

> It shall be unlawful for any person to discharge . . . or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140.  Congress enacted Section 510 to protect plan participants against wrongful terminations to deprive them of the right to attain employee benefits.  <u>See</u> <u>Huske v. Honeywell Int'l Inc.</u>, 298 F. Supp.2d 1222, 1226 (D. Kan. 2004).

In determining whether plaintiff raises a triable issue of fact under Section 510, the Court applies the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See</u> <u>id.</u> at 1227.  Plaintiff initially bears the burden of production to establish a prima facie case of retaliation.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.  <u>See</u> <u>Reynolds v. Sch. Dist. No. 1</u>, 69 F.3d 1523, 1533 (10th Cir. 1995).  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."  <u>Beaird v. Seagate Tech., Inc.</u>, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting <u>Randle v. City of Aurora</u>, 69 F.3d 441, 451 (10th Cir. 1995)).

### a.      Prima Facie Case

Defendant contends that plaintiff cannot establish a prima facie case because she cannot show that it had specific intent to interfere with her attainment of ERISA benefits.  To establish a prima facie case, plaintiff must show that (1) she engaged in activity protected by ERISA; (2) defendant took adverse employment action against her; and (3) a causal connection exists between the two.  <u>See</u> <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1202 (10th Cir. 2006) (Title VII retaliation case); <u>Rath v. Selection Research, Inc.</u>, 978 F.2d 1087, 1091 (8th Cir. 1992) (ERISA retaliation case); <u>Harrell v. BG Prods., Inc.</u>, No. 04-1308-F, 2005 WL 1657038, at

19

*4 (W.D. Okla. July 5, 2005) (ERISA retaliation case).[18]  In this case, the parties do not dispute the

first two elements.  As to the third element, the close proximity between the time when plaintiff

began receiving short-term disability benefits (March 13, 2003) and her termination (March 21,

2003) is sufficient to show a genuine issue of material fact regarding causation, for purposes of

establishing a prima facie case.  See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir.

1999).

### b.      Pretext

Defendant asserts that plaintiff cannot show that its stated reason for discharge

– excessive absenteeism – is pretextual.  Plaintiff can show pretext by pointing to "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of

credence."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).  While

"[t]his burden is not onerous . . . it is also not empty or perfunctory."  Id. at 1323-24.  A plaintiff

typically shows pretext in one of three ways: (1) evidence that defendant's stated reason for the

adverse employment action is false, i.e. unworthy of belief; (2) evidence that defendant acted

contrary to a written company policy prescribing the action to be taken under the circumstances; or

(3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice

when making the adverse employment decision affecting plaintiff.  See Kendrick v. Penske Transp.

Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  More specifically, evidence of pretext may

---

[18]      The Court rejects defendant's contention that to establish a prima facie case plaintiff
must show (1) prohibited employer conduct, (2) taken for the purpose of interfering with (3) the
attainment of any right to which she might have become entitled.  See Memorandum In Support Of
Motion For Summary Judgment (Doc. #72) filed February 8, 2007 at 15.  The authority which
defendant cites, Huske v. Honeywell Int'l, Inc., 298 F. Supp.2d 1222, 1227 (D. Kan. 2004), involves
an ERISA interference claim, not an ERISA retaliation claim.

include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." <u>Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1328 (10th Cir. 1999).

Plaintiff argues that the following evidence demonstrates pretext: (1) the timing of her termination; (2) defendant's use of subjective criteria; (3) defendant's prior treatment of plaintiff; and (4) procedural irregularities.

## I.      Timing

Plaintiff asserts that the close temporal proximity between the time when she began receiving short-term disability benefits on March 13 and her termination eight days later, on March 21, 2003, supports a finding of pretext. <u>See</u>  <u>Plaintiff's Memorandum</u> (Doc. #76) at 16.  Temporal proximity may give rise to an inference of retaliation, but it is not sufficient standing alone to raise a genuine issue of fact as to pretext. <u>See</u> <u>Williamson v. Deluxe Fin. Servs., Inc.</u>, No. 03-2538-KHV, 2005 WL 1593603, at *8-9 (D. Kan. July 6, 2005).  The Court will therefore consider temporal proximity in conjunction with plaintiff's other evidence of pretext.

## ii.      Subjective Criteria

Plaintiff contends that the fact that defendant used subjective criteria under its absentee policy supports a finding of pretext.  Specifically, plaintiff points to policy language that "[t]here is no absolute mathematical standard for determining good or bad attendance." Plaintiff also points to defendant's practice of deciding whether to terminate an employee on a case-by-case basis.  Plaintiff argues that the fact that defendant's policy allows subjective decision-making provides an opportunity for unlawful discrimination. <u>See</u> <u>Plaintiff's Memorandum</u> (Doc.

#76) at 16-17.  In <u>Pippin v. Burlington Res. Oil & Gas Co.</u>, 440 F.3d 1186 (10th Cir. 2006), the Tenth Circuit stated that while the use of subjective criteria may be relevant to the pretext determination, it ordinarily is not sufficient in itself to establish pretext.  <u>Id.</u> at 1195; <u>see also</u> <u>Officer v. Sedgwick County, Kan.</u>, No. 05-3407, 2007 WL 587263, at *7 (10th Cir. Feb. 27, 2007) (no pretext showing where termination decision within discretion afforded under discipline policy).  The Court will therefore consider defendant's use of subjective criteria in conjunction with plaintiff's other evidence of pretext.

### iii.     Prior Treatment Of Plaintiff

Plaintiff contends that in 1998, defendant assessed five occurrences against her but still determined that she was meeting attendance expectations.  Plaintiff asserts that such treatment is inconsistent with defendant's treatment of her in 2003, when she had two occurrences and defendant terminated her employment.  Plaintiff argues that this evidence supports an inference that defendant discharged her in 2003 because she was receiving short-term disability benefits.  The problem with plaintiff's argument is that she presents no evidence regarding the circumstances surrounding the five occurrences in 1998.  <u>See</u> <u>Plaintiff's Memorandum</u> (Doc. #76) at 17-18.  The uncontroverted evidence establishes that defendant did not terminate plaintiff based solely on the number of occurrences, but also considered the length and reason for the absences.  Plaintiff provides no evidence regarding the length or reason for her absences in 1998.  Moreover, plaintiff does not address the facts that at the time she incurred the second occurrence in 2003, she had already incurred substantial absences during the previous year (2002) for which defendant disciplined her and defendant had already placed her on DML for excessive absenteeism.  On this record, the fact that plaintiff had five occurrences in 1998 does not support an inference that

defendant's stated reason for the termination – excessive absenteeism – is pretextual.

### iv.     Procedural Irregularities

Plaintiff contends that Morris engaged in a disturbing procedural irregularity when she called and threatened that plaintiff would lose her job if she did not report to work by December 16, 2002.  Crawford testified that if Morris did make such a call, it was contrary to defendant's policy.  Not every policy violation, however, demonstrates pretext.  See, e.g., Randle, 69 F.3d at 454-55; Russell v. Vanguard Group, No. 04-3269, 2006 WL 2077010, at *3 (E.D. Pa. July 24, 2006); Poff v. Prudential Ins. Co. of Am., 911 F. Supp. 856, 861 (E.D. Pa. 1996).  Plaintiff must show that the alleged policy violation undermines defendant's stated reason for firing her.  See Randle, 69 F.3d at 454-55.

Plaintiff asserts that as a result of the call, she returned to work on December 16 and received two occurrences instead of one for her absences from August 20 through December 31, 2002, part of which were covered by short-term disability benefits.  See Plaintiff's Memorandum (Doc. #76) at 18.  Plaintiff further contends that the two occurrences formed part of the basis for her discharge. The undisputed evidence, however, establishes that defendant did not fire plaintiff based solely on the number of occurrences.  Plaintiff has no evidence that defendant decided to fire her because she received two occurrences instead of one.  Furthermore, on this record, plaintiff has not shown that the phone call – even if it was irregular – was a relevant or disturbing irregularity, or casts any doubt on defendant's explanation that it fired plaintiff because of excessive absenteeism.

### v.     Total Evidence Of Pretext

In sum, plaintiff's evidence of pretext amounts to close temporal proximity and the use of subjective criteria.  Taken together, this evidence does not raise a triable

issue as to pretext.  To show pretext, plaintiff must produce evidence which demonstrates a genuine

issue of fact whether defendant's stated reason for the termination – excessive absenteeism – is a

fabrication designed to conceal an unlawful reason.  See Kulumani v. Blue Cross Blue Shield Ass'n,

224 F.3d 681, 684 (7th Cir. 2000).  On this record, the evidence overwhelmingly supports the fact

that plaintiff was indeed excessively absent from work.  Plaintiff has not demonstrated a genuine

issue of material fact whether defendant's stated reason for the discharge is pretextual.

## III.    Mixed Motives Theory

Plaintiff contends that she can overcome summary judgment under a mixed-motive theory

of retaliation.  In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), a Title VII gender

discrimination case, the United States Supreme Court found that when plaintiff challenges an

employment decision that may have been the product of a mixture of legitimate and illegitimate

motives, i.e. mixed motives, she need not squeeze her proof into the McDonnell Douglas burden-

shifting framework.  Id. at 246-47.  Rather, the Supreme Court held that once plaintiff shows that

an improper motive played a motivating part in an employment decision, defendant may avoid

liability if it proves that it would have made the same decision despite the improper motive.  Id. at

244-45.[19]  After Price Waterhouse, many courts required that plaintiffs present direct evidence of

discrimination to proceed on a mixed-motive theory.  See, e.g., Mohr v. Dustrol, Inc., 306 F.3d 636,

640-641 (8th Cir. 2002); Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (11th Cir.

1999); Trotter v. Bd. of Trustees of Univ. of Ala., 91 F.3d 1449, 1453-54 (11th Cir. 1996); Fuller

---

[19]    The Civil Rights Act of 1991 overruled Price Waterhouse to the extent that decision held that an employer could avoid liability under Title VII by proving it would have taken the same action absent the unlawful motive.  See 42 U.S.C. § 2000e-2(m).  The amended statute merely restricts plaintiff's remedies – as opposed to absolving liability altogether – if defendant shows that it would have taken the same action absent the unlawful motive.  See 42 U.S.C. § 2000e-5(g)(2)(B).

v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995).[20]  In Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003), however, the Supreme Court clarified that a plaintiff could proceed on mixed-motive theory with only circumstantial evidence.

Here, plaintiff cites two pieces of circumstantial evidence.  First, she points to the fact that she received short-term disability benefits for three of the occurrences which formed the basis for her termination.[21]  Plaintiff claims that because she received short-term disability benefits for those absences, a reasonable fact finder could infer that the termination decision was motivated in part by her exercise of rights under ERISA.  In other words, plaintiff contends that the fact that she received short-term disability payments during these absences supports a finding that, at least in part, defendant fired her because she was receiving such benefits.  See Plaintiff's Memorandum at 13.

In Lindemann v. Mobil Oil Corp., 141 F.3d 290, 297-98 (7th Cir. 1998), the Seventh Circuit rejected a similar argument.  Plaintiff asserted that where an employee uses ERISA-protected short-term disability benefits, an employer cannot use those absences as a legitimate reason for discharge.  The Seventh Circuit disagreed, finding that an employer can terminate an employee based on such absences so long as the employer terminates the employee because of the absences and not because she received benefits.  See id. at 297.  Although the Tenth Circuit apparently has not addressed the issue, the Court believes that it would follow the Seventh Circuit's reasoning in this regard.  Accordingly, the mere fact that plaintiff received short-term disability benefits for the absences for

_____

[20]    The Tenth Circuit, however, stated that plaintiffs could proceed on a mixed-motive theory with direct or circumstantial evidence.  See, e.g., Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 550 (10th Cir. 1999).

[21]    According to plaintiff, those three occurrences are October 29 through December 16, 2002; December 17 through December 31, 2002; and March 6 to March 21, 2003.  See Plaintiff's Memorandum at 13.

which defendant fired her does not demonstrate a genuine issue of material fact whether plaintiff's receipt of such benefits motivated the termination decision.

Second, plaintiff asserts that Crawford's deposition testimony shows an improper motive. Specifically, plaintiff points to Crawford's statements that (1) in March of 2003, he knew that plaintiff was in the hospital and might apply for disability benefits; and (2) when he consulted with Ross about the termination decision, one of the factors which he considered was that plaintiff might apply for disability benefits. Taken as a whole, this evidence does not support an inference that plaintiff's receipt of benefits played a motivating part in the termination decision. As an initial matter, it was Ross – not Crawford – who made the termination decision. Crawford testified that he typically consulted with Ross and recommended to her whether to fire an employee under his supervision, but that he does not remember doing so in this case. See Crawford Depo. at 171:23-173:25. Crawford further testified that he would have been in consultation with Ross and that he would have considered among many factors, the fact that plaintiff might apply for or be on disability, but that he did not recall how that fact would have factored into his recommendation, i.e. whether that information would weight in favor or against termination in his decision-making process. Id. at 175:19-176:13. At most, this testimony shows that Crawford knew that plaintiff might have applied for or been receiving disability benefits for her absence. It does not support a reasonable inference that he recommended discharging plaintiff based on that consideration.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion For Reconsideration (Doc. #73) filed February 8, 2007 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that defendant's Motion For Summary Judgment (Doc. #71) filed February 8, 2007 be and hereby is **SUSTAINED.** The Clerk is directed to enter judgment in

favor of defendant on all claims.

Dated this 6th day of April, 2007 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge